[Cite as *State v. Sheckles*, 2023-Ohio-133.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-220255 |
| | | C-220256 |
| Plaintiff-Appellant, | : | TRIAL NO. B-1907173 |
| vs. | : | |
| | | *O P I N I O N.* |
| SONTEZ SHECKLES, | : | |
| Defendant-Appellee. | : | |

Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal: January 18, 2023

*Mark Piepmeier*, Interim Hamilton County Prosecuting Attorney, and *Ronald Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellee.

**ZAYAS, Judge.**

{¶1} The state appeals from the trial court's pretrial rulings on two motions in limine, one prohibiting a state's witness from testifying at trial, and one excluding a compilation video that the state intended to introduce at trial. For the following reasons, we affirm the judgments of the trial court.

### Factual Background

{¶2} On January 2, 2020, Sontez Sheckles was charged with attempted murder with gun specifications, felonious assault with gun specifications, and having weapons while under a disability, stemming from a shooting that occurred at Chalet Bar on November 29, 2019. The case was scheduled for a bench trial on May 12, 2022. Although Sheckles was ready to proceed, the state requested a continuance to procure a witness to authenticate a compilation video created by a Cincinnati police officer from raw footage obtained from the cameras at Chalet Bar. Over objection by Sheckles, the court continued the trial until May 25, 2022. The court warned the prosecutor that if the witness were not present, the video would be excluded.

{¶3} A week later, the state emailed a certified copy of a federal plea agreement to defense counsel that it intended to introduce at trial. The document had been certified that day. In a federal case related to the shooting, Sheckles had pleaded guilty to possession of ammunition. In order to introduce the document, the state subpoenaed Zachary Kessler to testify. Kessler, a former prosecutor for the United States Department of Justice, had participated in the federal plea agreement. The state had previously notified Sheckles on April 7, 2022, that Kessler had been added to its witness list.

{¶4} On the morning of the rescheduled trial, Sheckles filed a motion to quash the subpoena issued to Kessler. The basis of the motion was that Kessler, as a

2

former Department of Justice employee, was prohibited from testifying or producing documents acquired while performing his official duties without obtaining prior approval by a Department of Justice official under 28 C.F.R. 16.22. The prior approval is referred to as a "*Touhy* letter."

{¶5} The prosecutor informed the court that Kessler was present and would testify about the federal plea and the written statement included in the plea documents. Kessler represented to the court that he had spoken with Brandi Stewart at the United States Attorney's Office that morning, and she would try to contact the court or provide the *Touhy* letter sometime that day.

{¶6} The court reviewed the plea document, but the document is not part of this record. The prosecutor informed the judge that it was a lengthy document, and the last page was a statement of facts acknowledged by Sheckles when he pled guilty to possession of ammunition. When the court informed the state that Kessler could not testify without the letter, the prosecutor responded that Kessler could "testify in part without the letter." However, the prosecutor never explained why Kessler could testify without the *Touhy* letter or proffered the testimony of Kessler that would be admissible without the *Touhy* letter.

{¶7} The judge again asked when the *Touhy* letter would be available, and Kessler responded that he was told, "by today," but, "I don't know." The court explained that it could not determine whether Kessler could testify without the letter. Kessler offered to contact Stewart again to obtain more information. Notably, Kessler never represented to the court that he could testify without the authorization.

{¶8} The court informed defense counsel that Sheckles did not have standing to object to the subpoena, but could file a motion in limine. The proceedings were

paused, and Sheckles filed a motion in limine addressing Kessler's testimony. When the proceedings resumed, the court gave the state the opportunity to respond to the motions in writing, but the prosecutor stated he would respond orally.

{¶9} The court addressed the authentication of the video, which had prompted the state's prior continuance. The state had the husband and wife, who co-owned the bar, present to testify. Sheckles objected to the witnesses because they had not been previously disclosed by the state and further argued that the witnesses could not authenticate a compilation video created by the Cincinnati Police Department. The video was produced from raw footage, and Sheckles had not received any raw video in discovery, only the compilation video.

{¶10} The prosecutor confirmed that the raw footage had been requested in discovery, and that Sheckles had been informed of the raw footage, but did not ask to view it at the prosecutor's office or provide a computer disc, so it was not provided. Instead, the state provided a compilation video. According to the state's discovery response, the state provided "surveillance videos from Chalet nightclub." The discovery response did not mention any additional video footage. The prosecutor also admitted that the state did not supplement its discovery response with any additional witnesses, including the names of the bar owners. The prosecutor admitted the omissions could be considered discovery violations, and argued that the court was obligated to rule on any discovery violations in the least restrictive manner.

{¶11} The court expressed its frustration that these issues were not addressed prior to trial given the length of time the case was pending. The case had been pending prior to the judge taking the bench. The court concluded, "And I think it's bad faith on the prosecution not to have all this to you before the day of trial. * * * And I'm just

putting that on the record because you know where I'm going with this."

{¶12} The court further stated that they had been waiting three hours for a *Touhy* letter and asked Kessler for an update. Kessler represented that the letter had been sent to the prosecutor's office, and forwarded to him so that he knew "the extent to which the *Touhy* letter authorization is granted with respect to the testimony that I can be expected to give today." Kessler represented that he had a copy of the letter on his phone, "so as far as he knew."

{¶13} The trial court excluded Kessler's testimony because the *Touhy* letter was never produced. Although the prosecutor offered to give the court Kessler's cell phone, the state never submitted the *Touhy* letter to the court or proffered it for the record on appeal.

{¶14} After another break, the parties addressed the authentication of the video. The witness who was available to authenticate the video was a co-owner of the bar. When it was discovered that he had a criminal record that prohibited him from owning a bar, the state decided to call his wife and co-owner of the bar, Victoria Evans, to authenticate the video. However, the state had already released her from testifying, so another pause was taken to await her return.

{¶15} Upon her return, Evans testified that she co-owned the Chalet Bar with her husband when the incident occurred. Evans confirmed that the bar has multiple cameras in different locations, but she does not download videos from the recording system or cut and splice them together. On November 29, 2019, detectives or police officers removed the hard drive containing all the video recordings from the bar.

{¶16} The following exchange occurred between Evans and the judge:

Judge: Have you ever seen this compilation video?

5

Evans: This?

Judge: Yes.

Evans: Like put the whole video, no.

Judge: That's all I need to know.  You can't say that you've seen this whole video?

Evans: The whole video or –

Judge: This compilation the way it's presented in court today.

Evans: No.

**{¶17}**  When questioned by the state, Evans acknowledged that she had a video on her phone that she had watched a few minutes before testifying.  She confirmed that the video showed the outside of the bar and different scenes from the inside of the bar from four different cameras.  When asked "were those authentic videos of your bar and your recording system from that night?," she responded, "They were."

**{¶18}**  The court determined that Evans could not authenticate the video because her equipment did not produce the video, and she did not know how it was cut or spliced together.  The court reminded the state that the sole purpose of the hearing was to authenticate the video, and the court was unwilling to wait for the state to procure the officer who created the video.  The court granted the motion in limine to exclude the video.

**{¶19}**  The state asked the court to reconsider the rulings.  When the court declined, the prosecutor informed the court that the state was not ready to proceed to trial, and instead, would appeal the decision.  The state did not seek to admit the compilation video into evidence or proffer it for the record on appeal.

**{¶20}**  The state appealed both orders, in accordance with Crim.R. 16(K),

certifying in its notice of appeal that "(1) the appeal is not taken for purpose of delay; and (2) the ruling excluding evidence has rendered the State's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed."

### Standard of Review

{¶21} A motion in limine, if granted, is a tentative, precautionary ruling by the trial court that reflects its anticipated treatment of the evidence until the admissibility can be determined during trial. *State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986). Generally, appellate courts review rulings on motions in limine for an abuse of discretion, but where, as here, the state certifies that the ruling is the functional equivalent of a suppression ruling, we use the standard of review for motions to suppress. *See State v. Thyot*, 2018-Ohio-644, 105 N.E.3d 1260, ¶ 16 (1st Dist.).

{¶22} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

### Law and Analysis

{¶23} In the first assignment of error, the state contends that the trial court erred in excluding Kessler's testimony. Specifically, the state argues it had the *Touhy* letter available in court, but that the court refused to review it. The state further argues that the court erred by excluding Kessler's testimony pursuant to a motion in limine, and instead, should have allowed the state to produce the letter at trial before ruling

on the admissibility of Kessler's testimony. Finally, the state asserts that no legal rule prohibited Kessler from testifying other than possible consequences from the Department of Justice.

{¶24} Although the state contends that the *Touhy* letter was available for the court to review, that is not what the record reflects. Rather, the record reflects that the letter **may** have been attached to an email contained on Kessler's cell phone. Significantly, the record reflects that the state never produced the letter to the trial court. Moreover, the content of the letter was never proffered in court or made part of the record on appeal. Therefore, we find no merit to this argument.

{¶25} The state contends that the court should have allowed it to produce the letter at trial before definitively ruling to exclude Kessler's testimony prior to trial. However, after the court ruled on the motion in limine, the state chose to appeal the ruling instead of proceeding to trial. We cannot speculate as to whether the court would have allowed the state to present a *Touhy* letter at trial and admitted Kessler's testimony.

{¶26} Without citing to any legal authority, the state claims that the federal regulation does not prohibit a witness from testifying, rather, it merely subjects an employee to possible consequences from the Department of Justice if the employee testifies without prior authorization.

{¶27} 28 C.F.R. 16.22 states in relevant part:

(a) In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or

based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part.

* * *

(c) If oral testimony is sought by a demand in any case or matter in which the United States is not a party, an affidavit, or, if that is not feasible, a statement by the party seeking the testimony or by his attorney, setting forth a summary of the testimony sought and its relevance to the proceeding, must be furnished to the responsible U.S. Attorney. Any authorization for testimony by a present or former employee of the Department shall be limited to the scope of the demand as summarized in such statement.

{¶28} Thus, 28 C.F.R. 16.22 forbids former employees of the Department of Justice from testifying in proceedings in which the United States is not a party, without the prior approval of the department. To obtain prior approval, a party seeking that testimony must furnish an affidavit or statement summarizing the testimony sought. 28 C.F.R. 16.21(b). The regulations controlling the testimony of former employees are valid. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-469, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

{¶29} However, the state did not raise this argument in the trial court and has therefore forfeited the issue for appellate review. *See State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986) (It is a well-established rule that "an appellate court

will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."). Even assuming the issue was preserved for appeal, "absent a proffer or questioning that makes the substance of the excluded evidence apparent, a party cannot argue before an appellate court that the trial court erred in the exclusion of evidence." *Ellinger v. Ho*, 10th Dist. Franklin No. 08AP-1079, 2010-Ohio-553, ¶ 34; *State v. Lovelace*, 137 Ohio App.3d 206, 223, 738 N.E.2d 418 (1st Dist.1999) ("We cannot pass on the admissibility of proffered [evidence] not before us based solely on the representations of counsel as to what those exhibits contain.").

{¶30} Although the prosecutor represented to the court that Kessler could "testify in part without the letter," the prosecutor did not proffer the specific testimony that Kessler could provide without the letter, and Kessler did not confirm the accuracy of that statement. Contrary to the dissent's finding that Kessler "expressed his willingness and ability to testify," the record reflects that Kessler, as a former employee, never represented to the court that he was willing or able to testify without the *Touhy* letter. Instead, he explained to the court that the letter would inform him of "the extent to which the *Touhy* letter authorization is granted with respect to the testimony that I can be expected to give today." Kessler indicated that he had contacted the appropriate person at the United States Attorney's Office "to acquire a *Touhy* letter pursuant to [his] testimony."

{¶31} 5 U.S.C. 301 authorizes federal agencies to adopt regulations that govern "the conduct of [their] employees ... and the custody, use, and preservation of [agency] records, papers and property." 28 C.F.R. 16.22(a) and (c), which govern

proceedings in which the United States is not a party, prohibits testimony by former employees "without prior approval of the proper Department official." Even if Kessler expressed a willingness to testify, his testimony was prohibited absent prior approval. *See id.*

{¶32} The dissent claims that "Sheckles failed to demonstrate that the Department of Justice did not waive any privilege of nondisclosure provided by its regulations." This assertion ignores the fact that the federal regulations require the department's approval prior to Kessler's testimony. "[P]roperly promulgated agency regulations implementing federal statutes have the force and effect of federal law which state courts are bound to follow." *Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir.1989) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-296, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)). A state court cannot allow a federal official to testify absent compliance with the regulations requiring agency approval. *See id.* "Such action plainly violates both the spirit and the letter of the Supremacy Clause." *Id.* Thus, without prior approval of the proper official in the form of a *Touhy* letter, the court could not have compelled Kessler's testimony, and Kessler gave no indication that he would testify without the protection of the letter. *See id.*

{¶33} Accordingly, we overrule the first assignment of error.

{¶34} In the second assignment of error, the state argues that the trial court erred in excluding the compilation video because it adequately authenticated the video. Video evidence may be admissible under one of two theories: the "pictorial testimony" theory or the "silent witness" theory. *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agricultural Implement Workers, Local 486*, 61 Ohio St.3d 121, 129, 573 N.E.2d 98 (1991). Under the pictorial-testimony theory,

evidence is admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness's personal observation. *Id.* at 129-130. Thus, the evidence is merely illustrative of a witness's testimony. *Id.* Under the silent-witness theory, the evidence is a "silent witness which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness," and the evidence may be admitted "upon a sufficient showing of the reliability of the process or system that produced the evidence." *Id.* at 129.

{¶35} Here, Evans testified that she co-owned the bar with her husband, and the bar has multiple cameras that record different angles of the bar. Evans does not download video from the recording system, and on the night in question, the police took the hard drive containing all of the recorded video. When shown the compilation video, Evans confirmed the video depicted the bar, but testified that she had never seen it before. On cross-examination, she acknowledged that she had a video on her phone that she had watched a few minutes before testifying, and she agreed that the video depicted her bar and was from her recording system.

{¶36} Evans did not testify that she was present on the night of the shooting or that the video was an accurate depiction of the scene of the shooting based on her personal observations. Therefore, Evans was not a sponsoring witness who testified based on her personal knowledge, and used the video to illustrate her testimony.

{¶37} Evans did not testify about the operation or reliability of the recording system and had not reviewed or downloaded the video on the night in question. Thus, her testimony did not establish the reliability of the bar's security system and was inadequate to authenticate the video as a silent witness. *Id.*

{¶38} Although she agreed that the video was from her recording system, the trial judge, who reviewed the video, found that the recording was not produced by the bar's recording system. And the prosecutor confirmed that the video was created by police computer experts.

{¶39} The dissent reasons that Evans's testimony authenticated the video under the silent-witness theory, relying on *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, *overruled in part on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475. In that case, the witness's testimony based on "personal knowledge about the installation of the surveillance system, the positioning of the cameras, and the method used for recording the video * * * showed the reliability of the surveillance system and the videos produced by it." *Id.* at ¶ 151. Here, Evans did not provide any testimony about the recording system to establish its reliability.

{¶40} However, the recording was not admitted as an exhibit or proffered for our review. Significantly and as previously discussed, without the evidence, we cannot determine whether the trial court erred and must presume the regularity of the proceedings. *See Ho*, 10th Dist. Franklin No. 08AP-1079, 2010-Ohio-553, at ¶ 34; *Lovelace*, 137 Ohio App.3d at 223, 738 N.E.2d 418; *State v. Barnes*, Slip Opinion No. 2022-Ohio-4486, ¶ 54 (Fischer, J., dissenting) ("[The appellant] has the burden to ensure that all the evidence that is needed to resolve his appeal is before the court. * * * So, since we cannot review the gunshot video, we cannot evaluate [appellant's] claim. Consequently, regularity of the trial court's proceedings is presumed, *Natl. City Bank v. Beyer*, 89 Ohio St.3d 152, 160, 729 N.E.2d 711 (2000), and we must affirm the judgment of the [trial court].").

{**¶41**} The state further argues that the court erred by not waiting for an additional witness to authenticate the video or allowing the state to have a witness authenticate the video during trial. At the first trial setting, the state requested a continuance specifically to secure a representative from the bar to authenticate the video. At that time, the court warned the state that the video would be excluded if the state failed to produce a witness to authenticate the video. At the second trial setting, the state produced the testimony of Evans, but she was unable to authenticate the video, prompting the court to grant the motion in limine to exclude it. Instead of proceeding to trial and attempting to authenticate the video during the trial, the state decided to appeal. We cannot and should not speculate as to whether the court would have allowed the state's additional witness to testify during the trial, especially when the court itself characterized the ruling as a motion in limine, which by definition is a preliminary ruling. We overrule the second assignment of error.

### Conclusion

{**¶42**} Having overruled the state's two assignments of error, we affirm the judgments of the trial court.

Judgments affirmed.

**BERGERON, J.,** concurs.
**MYERS, P.J.,** dissents.

**MYERS, P.J.,** dissenting.

{**¶43**} Because I would hold that Sheckles failed to establish any legal evidentiary basis for excluding the testimony of Kessler, and because I believe that the bar owner's testimony was sufficient to authenticate the videotape, I dissent.

{**¶44**} Generally, motions in limine are preliminary only, and any definitive evidentiary ruling needs to await trial. *See State v. Edwards*, 107 Ohio St.3d 169,

2005-Ohio-6180, 837 N.E.2d 752, ¶ 17. In the normal course, a court might give a preliminary ruling on how it might decide any evidentiary issue but would inform counsel that any objection would need to be renewed during trial when the evidence was offered, thus giving the court an opportunity to view the evidence in context, to consider it along with all the other evidence, and to make a final determination. *Id.* (trial court deciding a motion in limine "is at liberty to change its ruling on the disputed evidence in its actual context at trial"). That was not done here, and the state has taken an appeal, arguing that the court's rulings were final appealable orders rather than preliminary rulings.

{¶45} I agree with the majority that *State v. Thyot*, 2018-Ohio-644, 105 N.E.3d 1260 (1st Dist.), allows appeals of rulings on motions in limine if they are the functional equivalent of the granting of a motion to suppress. *See State v. Davidson*, 17 Ohio St.3d 132, 135, 477 N.E.2d 1141 (1985) (trial court's order granting defendant's motion in limine was a final appealable order because it rendered the state's proof "so weak in its entirety that it destroyed any reasonable possibility of effective prosecution."). And because the court below seemed to make a definitive ruling rather than a preliminary one, I reluctantly agree that we can review it. I caution, however, that this should be a rare occurrence. Motions in limine are preliminary for a reason, and we should generally treat them as such. And, I agree with the majority that under *Thyot*, we can review these rulings as we would a ruling on a motion to suppress.

### *Procedural and Factual Background*

{¶46} Before I review the merits of the trial court's rulings, a discussion of the procedural posture of the case helps put the rulings in context. As the majority noted, Sheckles was indicted in January 2020 and the case was scheduled for a bench trial on

May 12, 2022, when the state first requested a continuance. As the majority points out, at the May 25 trial date, the court expressed irritation at having to decide issues relating to Kessler's testimony and video authentication just prior to trial, going so far as to accuse the prosecutor of having acted in bad faith. To be fair, though, none of the delays during the two years and four months that the case was pending prior to the first trial setting on May 12 were attributable to the state.

{¶47} Remember, the shooting occurred in November 2019, Sheckles was indicted by the state in January 2020, and at some point, before the first trial setting on May 12, 2022, he entered a plea in federal court. The case was continued multiple times due to Sheckles's request or his absence. Specifically, Sheckles moved to continue the case three times between his indictment in January 2020 and his retaining of new counsel in March 2020. It was again continued at his request to April 2, 2020, for plea or trial setting because Sheckles had, according to the court's entry, a "holder for APA/federal," which makes sense given his federal prosecution arising from the shooting at the Chalet Bar. When Sheckles failed to appear at the April setting, the court issued a capias for his arrest.

{¶48} Then in November 2021, more than a year and a half after Sheckles had made a court appearance in the case (and months after the trial judge assumed office), Sheckles filed in the trial court a petition for a writ of habeas corpus ad prosequendum, asking the trial court to order his return from the Butler County, Ohio jail where he was detained, for prosecution on this case in Hamilton County. The trial court continued the matter until February 16, 2022, for a hearing on Sheckles's petition. At that hearing, the court granted Sheckles's petition, ordered his return to Hamilton County, and continued the matter at Sheckles's request until March 18, 2022.

16

**{¶49}** The trial court continued the matter yet again at Sheckles's request from March 18 until May 12, 2022, for a bench trial. In April 2022, the state supplemented its discovery response to notify Sheckles that Zachary Kessler, the former federal prosecutor in Sheckles's related federal case, was added to its witness list.

**{¶50}** It was at that May 12 trial setting that the state first requested a continuance in the case to secure "a representative from the Chalet Bar where this incident occurred to authenticate a video," and the court rescheduled the trial for May 25.

**{¶51}** Then at the May 25 trial setting, defense counsel told the court that he had just filed that morning a motion to quash the state's subpoena of Kessler's testimony. The record reflects that the motion was filed at 8:38 a.m. Defense counsel acknowledged that he had been "put on notice via supplemental discovery [in April 2022] that they intended to call [Kessler] as a witness. At our last trial setting on May 12th the State of Ohio indicated he was going to testify."

**{¶52}** Although Sheckles's written motion to quash Kessler's subpoena was based upon a potential violation of federal regulations, defense counsel first argued the untimeliness of the state's provision of the federal plea form in discovery. In addition to his argument that the state did not provide the plea form in discovery until a week before the rescheduled trial, defense counsel also argued that the plea form violated federal regulations and that *Kessler*, not Sheckles, could face sanctions for testifying:

> In reviewing the document that we received, it's in direct violation of the Code of Federal Regulations. * * * *Zachary Kessler is*

*going to be subject to sanctions if he takes the stand and testifies,*

*particularly to the federal issues that are here.*

(Emphasis added.)

**{¶53}** As the majority states, the prosecutor informed the court that Kessler would testify about the federal plea agreement. The prosecutor was specific in his explanation of the testimony:

> [Kessler] took the federal plea in which Mr. Sheckles admitted to everything that he did in the State's case that we have charged him here with. There's been a full page written statement acknowledged by him in the plea form.

> Your Honor watched the video in chambers. If you recall, he admits to racking the gun where the full round was found near the stage and admits to the shell casing back by the back door where the shot was fired, so it's a full admission to all of the elements of the State's case.

**{¶54}** Defense counsel disagreed on the significance of the plea form. According to him, "None of what [the prosecutor] just described constitutes attempted murder or felonious assault. It constitutes possession of ammunition. That's it. That's what he pled to in the federal system." However, according to the prosecutor, in addition to the guilty plea, the form contained a statement of facts. The prosecutor said that he would provide the court with a copy of the plea form: "It's a rather long document. The last page contains the statement of facts acknowledged by the Defendant in Court." Referring to the plea form, the trial court said, "I wish I'd had this on Friday to review over the weekend." But there was no reason that *prior to trial and prior to any filing of a motion by the defense,* the prosecutor (or the defense)

would have provided trial evidence to the court. Remember, the motion to quash was just filed on the morning of trial.

**{¶55}** Despite all the discussion about whether Kessler had a *Touhy* letter, the court declared that it could not proceed "until I get that letter." Remember, the trial had not yet started. The state may have planned on presenting testimony of the shooting victim, witnesses from the Chalet Bar, first responders, physicians, and investigators before it planned to call Kessler to testify about Sheckles's plea in the related federal case. The state's presentation of evidence may have taken a day or more before it called Kessler. But the court, before trial started and while it was considering Sheckles's motion to quash Kessler's subpoena, required to see the *Touhy* letter. The court relied on defense counsel's assertion that Kessler's testimony would result in a "direct violation of" federal regulations and that Kessler, *not Sheckles*, "is going to be subject to sanctions if he takes the stand and testifies, particularly to the federal issues that are here." Then defense counsel seemed to acknowledge that there were other areas that Kessler could testify about, that would not require a *Touhy* letter, when he stated, "But there are also state issues, that if the Court let's [sic] him testify we can get into later on."

**{¶56}** Despite defense counsel's indication that Kessler could testify about "state issues," the court was not convinced by the prosecutor's explanation that Kessler could "testify in part without the letter." The court wanted "definites," saying that "we might as well go all the way and we'll discuss whether [Sheckles] is going to file a Motion in Limine to exclude [Kessler's] testimony." The state had not yet called Kessler as a witness at trial, but the trial court declared prior to trial that Kessler could not testify without the *Touhy* letter: "Right now he can't testify until he gets the letter."

{¶57} Then the court informed defense counsel that, "[u]nfortunately," while Sheckles had no standing to move to quash the subpoena, "[h]e can file a Motion in Limine so we don't hear [Kessler's] testimony." The proceedings were paused, and at 9:33 a.m., defense counsel filed the first of his two motions in limine to prevent Kessler from testifying. When the proceedings resumed and the prosecutor declined the court's invitation to file a written response to the just-filed defense motion, the court seemed frustrated again with the prosecutor and defense counsel:

> You guys are filing motions on the day of trial so I'm just following the procedures. He filed it today. I'm giving you the opportunity to file a response. If you don't want that opportunity, just say, no, I don't want it.

{¶58} Though the prosecutor had just then received the motion in limine regarding Kessler's testimony, he said he was prepared to respond orally at that time.

{¶59} Then the discussion turned to authentication of the video. In response to defense counsel's objections, the prosecutor replied that defense counsel knew that the state had the raw footage, that it was in the state's discovery response, and that "there's hours of raw footage." According to the state's discovery response, it provided "disclosure and inspection of the following information by the Defendant pursuant to [Crim.R.] 16(B)," and listed "Surveillance videos from 'Chalet' nightclub." The prosecutor indicated that defense counsel had not contacted him to request to inspect the videos or provided any computer discs for the state to make copies for him. The prosecutor said that the compilation video was admissible as a summary of voluminous recordings under the Ohio Rule of Evidence.

{¶60} After some discussion of the video authentication, the court said:

I don't know what I'm going to permit at this point. I'm kind of irritated that all of these are being filed and brought to my attention the day of trial when we have had, I don't know how many years to develop this case. Before I even took the bench you guys could have had all of this taken care of. Now you're just throwing stuff to me on the date of trial, which is very irritating. And I think it's bad faith on the prosecution not to have all this to you before the day of trial.

\* \* \*

And I'm just putting that on the record because you know where I'm going with this.

Replying for himself and for defense counsel, the prosecutor said, "In both of our defense, this thing was for a couple of years on a plea trac[k]."

**{¶61}** The proceedings were paused again. The record reflects that defense counsel filed a second motion in limine to exclude Kessler's testimony at 10:56 a.m, asserting that Kessler was prevented from testifying under the Ohio Rules of Professional Conduct. When the proceedings resumed, however, the court addressed only the first motion in limine, noted that nearly three hours had passed, and wanted to know, "Do I have that [*Touhy*] letter?"

**{¶62}** Kessler explained that Brandi Stewart, a federal prosecutor, sent the *Touhy* letter to him and to the prosecutor's office, stating "so that I know the extent to which the *Touhy* letter authorization is granted with respect to the testimony that I can be expected to give today." When Kessler was asked if he had a copy of the *Touhy* letter, he said he had the email on his phone. The prosecutor asked again, "You have it on your phone?," and Kessler replied, "I do as far as I know," and the prosecutor

21

offered to give the court the phone. Defense counsel argued, however, "They should have had that [*Touhy*] letter prior to supplementing discovery and let us know that Mr. Kessler intended to testify." The court confirmed with defense counsel that, in addition to his *Touhy* argument, he was arguing that the state had failed to provide the federal plea form in discovery in a timely manner: "Not only barring [Kessler's] testimony, but there was a document that they're going to present that was not given to you until Friday; is that correct?"

{¶63} The prosecutor argued in response:

Your Honor, [defense counsel] has known about this all along. The Defendant pled himself over a year ago. [Defense counsel] has known about this all along. There's no ambush here, no surprise. There's no prejudice. He's got the entry. He's had it for several days now. And under Lakeland, the Court should do nothing more than continue the case for him to review it.

No doubt the prosecutor was referring to the Supreme Court's decision in *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), which held that a trial court must impose the least severe sanction consistent with the rules of discovery for a discovery violation. And no doubt Sheckles's federal plea could not have come as a surprise to Sheckles, since it was his own plea.

{¶64} The trial court responded, "Motion to exclude Mr. Kessler's testimony and the document presented by Mr. Kessler will be granted."

### *Kessler Testimony*

{¶65} The trial court granted Sheckles's motion in limine to exclude Kessler's testimony, including his testimony about Sheckles's plea. A motion in limine is a

request that the court exclude evidence or witness testimony which the movant believes to be improper. *Columbus v. Burgess*, 10th Dist. Franklin No. 19AP-392, 2021 Ohio App. LEXIS 2154, 7 (June 29, 2021); *State v. Winston*, 71 Ohio App.3d 154, 158, 593 N.E.2d 308 (2d Dist.1991). At the hearing on a motion in limine, the burden of proof is on the movant who seeks to exclude the evidence. *State v. McCormick*, 5th Dist. Stark No. 2000CA00204, 2001 Ohio App. LEXIS 430, 9 (Feb. 5, 2001). In this case, though, rather than put the burden of proof on Sheckles, the movant seeking to exclude Kessler's testimony and the federal plea form, the trial court improperly shifted the burden to the state to prove, prior to trial, that the evidence should not be excluded. This backward approach contributed to the trial court's erroneous ruling.

{**¶66**} The trial court in essence ruled that it would not let Kessler testify unless the state produced a *Touhy* letter prior to trial. I would hold that this was error.

{**¶67**} To exclude a witness's testimony, there must be an evidentiary basis to do so. So we start with the Ohio Rules of Evidence. I find nothing in the rules that would preclude Kessler from testifying.

{**¶68**} In general, every person is competent to be a witness unless the rules provide otherwise. *See* Evid.R. 601(A). Under Evid.R. 601(B), for example, a person is disqualified to testify under certain circumstances, none of which applied in this case. Specifically, Evid.R. 601(B) disqualifies a witness who is incapable of expressing himself or herself or of understanding the duty to tell the truth, and in certain circumstances, a spouse testifying against the other spouse, an officer enforcing traffic laws, or an expert in a medical claim. Sheckles raised no challenge below or on appeal to Kessler's competency to testify.

{¶69} The Rules of Evidence and Ohio law also recognize some limited privileges that can be asserted to prevent a witness from testifying. The privilege belongs to the person who possesses it, and not someone else. Here, if any "privilege" existed that could be invoked, it was Kessler who had the ability to invoke the privilege, not Sheckles, and Kessler made no such claim of privilege.

{¶70} Even if we were to consider that Kessler properly invoked a privilege against self-incrimination or otherwise, under Evid.R. 501, the privilege of a witness is "governed by statute enacted by the General Assembly or by principles of common law as interpreted by the courts of this state in the light of reason and experience." To the extent that the federal regulations cited by Sheckles conferred upon the Department of Justice ("Department") the privilege of nondisclosure, the privilege was the Department's to waive, and the burden was on Sheckles to prove that the Department did not waive its privilege (or that Kessler did not waive his privilege against self-incrimination). Sheckles, though, failed to carry his burden.

{¶71} In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951), an employee of the Department of Justice refused to obey a subpoena duces tecum ordering production of papers of the Department, based upon a regulation issued by the Attorney General. *Touhy* at 463. The trial court found the employee in contempt of court for refusing to produce the subpoenaed records. *Id.* at 465. The Supreme Court affirmed the reversal of the trial court's judgment and upheld the validity of a federal regulation that conferred upon the Department of Justice the privilege of nondisclosure unless there had been a waiver of the privilege by the Attorney General. *Id.* at 465, 470. Because the Department employee had not been questioned on his willingness to submit the subpoenaed material to the court as to its

materiality and whether it should be disclosed, the Supreme Court did not reach the issue of how far the Department did or could waive any claimed privilege. *Id.* at 468.

**{¶72}** Here, the privilege of nondisclosure belonged to the Department of Justice. *See id.* at 465. Kessler did not assert the privilege on behalf of the Department—on the contrary, it is absolutely clear from the record that he was willing and able to testify. But the trial court refused to hear him.

**{¶73}** Moreover, the burden of showing that testimony or evidence ought to be excluded under a claimed privilege is on the party seeking to exclude it. *See State v. Brunson*, Slip Opinion No. 2022-Ohio-4299, ¶ 49 (attorney-client privilege); *Waldmann v. Waldmann*, 48 Ohio St.2d 176, 178, 358 N.E.2d 521 (1976) (attorney-client privilege); *Triplett v. Univ. Hosps. Cleveland Med. Ctr.*, 8th Dist. Cuyahoga No. 111271, 2022-Ohio-3553, ¶ 12 (party claiming peer-review-committee privilege must establish existence of committee that meets statutory definition and show that records are within scope of committee's review). Here, though, the trial court put the burden on the state to prove that the Department's nondisclosure privilege was not waived, instead of putting the burden on Sheckles, the party seeking to exclude the Department employee's testimony.

**{¶74}** The federal regulations cited by Sheckles in his motion in limine (and quoted by the majority) generally prohibit employees or former employees of the Department of Justice from testifying in a case in which the United States is not a party, without prior approval of the Department. *See, e.g.,* 28 C.F.R. 16.22(A). However, Sheckles cited no regulation or other authority for the proposition that the *Touhy* letter or authorization by the Department must be provided to the defense or to the trial court prior to the federal employee's testimony. And the majority cites no

legal authority for its holding that Kessler's testimony was properly excluded because the *Touhy* letter was not produced.

**{¶75}** Instead, the majority asserts, "Without citing any legal authority, the state claims that the federal regulation does not prohibit a witness from testifying, rather, it merely subjects an employee to possible consequences from the Department of Justice if the employee testifies without prior authorization." The majority concludes that "the state did not raise this argument in the trial court and therefore has forfeited the issue for appellate review." But *Sheckles himself* put the issue squarely before the trial court when *he* argued, "Zachary Kessler is going to be subject to sanctions if he takes the stand and testifies." So I disagree that the state cannot raise the same argument on appeal because the issue was obviously considered by, and accepted without question by, the trial court. Surely, the potential for Kessler's sanctioning was the *only* reason that the court excluded his testimony because Sheckles never once said how his rights to a fair trial would be impacted by Kessler's testifying without a *Touhy* letter.

**{¶76}** Under 28 C.F.R. 16.22(c), a party seeking oral testimony in a case in which the United States is not a party must furnish to the United States Attorney an affidavit or statement setting forth a summary of the testimony sought and its relevance to the proceeding. The requirement for such an affidavit or statement exists for oral testimony but does not apply to demands for material or information in the files of the Department of Justice or material acquired as part of the performance of that person's official duties. *See* 28 C.F.R. 16.22(a). Instead, when information other than oral testimony is sought by a demand, the responsible United States Attorney must request a summary of the information sought and its relevance to the proceeding.

*See* 28 C.F.R. 16.22(d). The regulations say nothing about the admissibility at trial of the testimony or materials without prior authorization, and they do not say that authorization must be provided to a trial court or to a party that did not issue the demand or subpoena to the Department.

**{¶77}** We must keep in mind that the defense did not raise the issue of the *Touhy* letter until the morning of trial on May 25 when it filed the motion to quash, which triggered the scramble for the letter that morning. Nothing cited by Sheckles indicated that the trial court was required or even entitled to know if the United States Attorney had approved Kessler's oral testimony and document production. If, as defense counsel argued, Kessler would face sanctions, that concern would be Kessler's alone and not the concern of Sheckles or the trial court (especially where Kessler expressed his willingness and ability to testify). Nonetheless, the state and Kessler still made the effort to get the letter emailed to the prosecutor's office and to Kessler, but the court had no interest in seeing if Kessler had the authorization on his phone. And Sheckles failed to demonstrate that the Department of Justice did not waive any privilege of nondisclosure provided by its regulations. The representations to the court by Kessler and the prosecutor certainly indicated otherwise. The prosecutor began to put on the record that he had the *Touhy* letter, but the court interrupted to ask, "Where is it?" The prosecutor replied, "It was here in the courtroom when you asked for it." The prosecutor also said, "Mr. Kessler had it on his phone and had it here and was ready to go." (Although the transcript attributes the last remark to one made by Kessler himself, we can safely presume that the prosecutor said that and that Kessler likely did not refer to himself as "Mr. Kessler.")

27

**{¶78}** The bottom line is that I do not think there was any legal basis for the trial court to rule that Kessler could not testify. And the majority has cited none.

## *Authenticity of the Video*

**{¶79}** In addition, I believe that the trial court erred by excluding the compilation video on the ground that the state failed to authenticate it.

**{¶80}** Under Evid.R. 901(A), authentication as a condition precedent to admissibility requires evidence sufficient to support a finding that the matter in question is what the proponent claims. An acceptable method of authentication is testimony by a witness with knowledge "that a matter is what it is claimed to be." *See* Evid.R. 901(B)(1). "Authentication is 'a very low threshold, which is less demanding than the preponderance of the evidence.' " *State v. Patterson*, 1st Dist. Hamilton No. C-170329, 2018-Ohio-3348, ¶ 13, quoting *State v. White*, 4th Dist. Scioto No. 03CA2926, 2004-Ohio-6005, ¶ 61. The proponent of the evidence must demonstrate a "reasonable likelihood" that the evidence is authentic. *Thyot,* 2018-Ohio-644, 105 N.E.3d 1260, at ¶ 21. In addition, "[a]ny defects in the testimony go to the weight of the evidence, not its authenticity." *Id.*

**{¶81}** The majority concludes that the state's failure to proffer the video for our review prevents us from concluding that the trial court erred in excluding it. However, pursuant to Evid.R. 103(A)(2), error may be predicated upon a ruling excluding evidence "where the substance of the evidence was made known to the court by offer *or was apparent from the context within which questions were asked*." While clearly a proffer of excluded evidence would be the better practice, it is not always required to preserve for appellate review, an evidentiary ruling alleged to be in error. *State v. Gilmore*, 28 Ohio St.3d 190, 191, 503 N.E.2d 147 (1986); *Ellinger v. Ho*, 10th

Dist. Franklin No. 08AP-1079, 2010-Ohio-553, ¶ 34. It is clear from the record that the challenged video was a compilation video created by police from raw footage obtained from the bar's surveillance cameras.

{¶82} Remember that the case was continued from May 12 to May 25 so that the prosecutor could bring in "a representative from the Chalet Bar where this incident occurred to authenticate a video." Then, on the morning of trial on May 25, when the court learned that the bar owners were present to authenticate the video, defense counsel objected on two grounds. First, he argued that their names had not been provided in discovery. Second, he argued that the only video he had been provided was the compilation video produced by the police, and not by the bar owners.

{¶83} The state had the bar owners present, as it indicated it would at the last trial setting. *It was not until the morning of trial on May 25* that the state found out that Sheckles would attack, *prior to trial*, the authentication of the video on the ground that police had prepared the summary video. The trial court made it clear, after the bar owner testified, that it did not believe that her testimony was sufficient to authenticate the video.

{¶84} When the court said, "I need the person who actually made the compilation video to tell me how they made that video," the prosecutor said he would arrange to get the person to court. But in another expression of its frustration, the court said:

> I'm going to put this on the record. What is it about the State
> that they think they can just dictate how the court process flows? You
> don't bring in the witnesses you need and then when you realize you do
> need somebody, you say, I'll just get a continuance and bring somebody

over. No one is ever ready until the Court questions where is this witness that I need to have this actual hearing that was scheduled for 9:00 and it is now 12:30.

{¶85} The prosecutor reminded the court that "this is a motion that was filed at 10:00 this morning," and the court countered, "Based on evidence you produced shortly." The prosecutor reiterated, "It's our position this witness has authenticated the video and that's all that's necessary." The court said that the bar owner did not produce the video. Things got testy again:

[PROSECUTOR]: I put her on and I have the other witness coming because the Court wants the other witness.

THE COURT: I don't want the other witness. If you don't want her, I'm fine. I don't need any other witness. I'm fine. I can make my decision with this one witness.

[PROSECUTOR]: I think you're telegraphing your decision, so we would like to bring the other witness.

* * *

THE COURT: The sole purpose was to bring in a witness to authenticate this video and the witness here in court can't authenticate the video. Now I have to wait yet another, I don't know how long, for this other person to appear. So the Motion in Limine will be granted. The video will be excluded.

{¶86} The majority brushes aside the state's argument on appeal that the court should have allowed the state to call the officer who produced the video. Incredibly, the majority says that we can't speculate as to whether the trial court would have

allowed the state's additional witness to testify during trial because, "[i]nstead of proceeding to trial and attempting to authenticate the video during the trial, the state decided to appeal." But *the trial court did not simply exclude the testimony of the additional witness who created the compilation video—the court excluded the video itself*, which the prosecutor described as a "critical piece[] of evidence." In other words, the court suppressed the *video*, so obviously the state could not have, as the majority suggests, tried to authenticate the video during trial. The video was *excluded from evidence before the trial even started*.

**{¶87}** Certainly, the state could not risk proceeding to trial without the video and potentially facing Sheckles's acquittal for insufficient evidence. The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal." *Bravo-Fernandez v. United States*, 580 U.S. 5, 9, 137 S.Ct. 352, 196 L.Ed.2d 242 (2016), quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). And "[t]he Government 'cannot secure appellate review' of an acquittal, * * * even one 'based upon an egregiously erroneous foundation.' " *Id.* at 10, quoting *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The reason we allow the state to appeal the granting of a pretrial motion in limine excluding evidence is because it "has rendered the state's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed." Crim.R. 12(K)(2); *Davidson*, 17 Ohio St.3d at 135, 477 N.E.2d 1141.

**{¶88}** The majority says that the bar owner did not testify about the operation or reliability of the recording system, and that she had not reviewed or downloaded the video. I disagree. In addition to testifying about the bar's multiple cameras that

record at various angles, she testified that she did not download the video because the police took the hard drive that contained all of the raw footage from that night. Obviously, she would not have had to "download" it if it was on the drive already. In addition, she clearly testified that she *had reviewed the video.* I include nearly all of the bar owner's testimony because in my mind it establishes the very low burden of authentication:

[DEFENSE COUNSEL]: Ma'am, do you recognize this video?

[THE WITNESS]: I do.

Q. What is it a video of?

A. This is our front patio, the entrance of the bar.

Q. Okay. I'm going to press Play[.] * * * Okay, ma'am, when you downloaded the camera footage do you have multiple cameras in your bar?

A. Yes.

Q. Okay. Each camera records a different angle?

A. Yes.

Q. And you personally don't cut and splice those videos together, do you?

A. No.

Q. So if an incident were to happen at your bar and the police come you download that video, correct?

A. I don't. They actually came and just took the equipment.

Q. Okay. So the police on November the 29th came to your bar?

A. Detectives, police, yes, somebody did.

Q. And they collected the equipment?

A. Umm-hmm.

Q. Is that equipment, is that like a hard drive?

A. It is a hard drive.

Q. And the hard drive contains all the raw footage from this night?

A. Yes.

THE COURT: I just have one question. This is the determining factor. Have you ever seen this compilation video?

THE WITNESS: This?

THE COURT: Yes.

THE WITNESS: Like put the whole video, no.

THE COURT: That's all I need to know. You can't say that you've seen this whole video?

THE WITNESS: The whole video or –

THE COURT: This compilation the was it's presented in court today.

THE WITNESS: No.

[PROSECUTOR]: You have a video of this on your phone?

[THE WITNESS]: I do.

Q. And is that the outside of your bar?

A. Yes, it is.

Q. On that date?

A. Yes.

Q. And you had occasion to watch this a few minutes ago?

A. Yes.

Q. Did you watch the whole thing?

A. Yes.

Q. Did it show the inside of your bar on that date in time?

A. Yes, it did.

Q. And it showed a couple different scenes from inside the bar, four different cameras?

A. Yes.

Q. And were those authentic videos of your bar and your recording system from that night?

A. They were.

**{¶89}** I believe that the bar owner's testimony easily crossed the very low threshold to authenticate the video under the silent-witness theory because the evidence showed the reliability of the camera system that produced the evidence. In a similar case, *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, *overruled in part on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 35, a property manager testified that he maintained 140 surveillance cameras on the property at an apartment complex. *Pickens* at ¶ 141. The state presented a video taken outside the defendant's apartment near the time of the offense, as well as a "surveillance video that spliced together different surveillance videos" from the property. *Id*. at ¶ 142-143. As to the spliced videos, the property manager testified that he provided multiple surveillance videos to the police and that the police spliced together multiple clips into a single disc "in an effort to make it better for a viewing audience." *Id*. at ¶ 144. The manager reviewed the spliced videos and

testified that it represented a true and accurate reflection of the various videos that he had provided to the police.

{¶90} The Supreme Court held that the spliced videos were admissible under the "silent witness" theory because the manager testified from personal knowledge about the installation of the surveillance system, the positioning of the cameras, and the method used for recording the videos. *Id.* at ¶ 151. The court held that "[n]o expert was required to substantiate the reliability of the surveillance system[,]" and that the spliced videos were properly authenticated where the state adequately showed the reliability of the surveillance system and the videos it produced. *Id.*

{¶91} We have similar authentication testimony in this case. The bar owner testified from personal knowledge that the raw footage from the bar's multiple cameras was contained on the hard drive collected by police, that she watched the entire compilation video which showed different scenes from different cameras in the bar, and that they were authentic videos of her bar and her recording system from the night of the offense. This testimony easily met the low threshold for authentication.

{¶92} The trial court, though, did not think so:

She has not authenticated the video. It's a video of a video. But she did not produce this video. Her equipment did not produce this video. It's a compilation of raw footage that she provided from her hard drive, so she did not produce this video. She doesn't know how it was cut or spliced or put together.

{¶93} Even though the trial court seemed satisfied that the bar's original raw footage from its hard drive met the authenticity test, the court excluded the compilation video created from that footage because it was "a video of a video."

However, Evid.R. 1006 allows the contents of voluminous recordings "which cannot conveniently be examined in court" to be presented in summary form. For a summary to be admissible, the "originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place." There was no allegation that the hours-long raw footage was altered in any way other than being reduced to a compilation for viewing purposes. And the prosecutor represented that the raw video footage was available for examination. The trial court erred by excluding the video prior to trial.

{¶94} I would reverse the judgments of the trial court and remand this cause for further proceedings. Respectfully, I dissent.

Please note:
The court has recorded its own entry this date.